**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4795-18T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

A.O.J.,[1]

     Defendant-Appellant,

and

R.D.B. and M.N.M.,

     Defendants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF R.D.B.,
II, and D.L.J.M.,

     Minors.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **June 5, 2020** |
| **APPELLATE DIVISION** |

Submitted April 22, 2020 – Decided June 5, 2020

Before Judges Fuentes, Haas and Mayer.

---

[1] We use initials and pseudonyms to refer to the parties and children to protect their privacy and preserve the confidentiality of these proceedings. R. 1:38-3(d)(12).

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0074-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Bruce P. Lee, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Amy L. Bernstein, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Margo E.K. Hirsch, Designated Counsel, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

Defendant A.O.J. is the biological mother of seven-year-old R.D.B. II (Robert) and six-year-old D.L.J.M. (Daniel).[2] She appeals from the Judgment of Guardianship entered by the Family Part terminating her parental rights to her two sons. The judge assigned to manage this case made the decision to

---

[2] The boys have different biological fathers. They were both named as defendants in this guardianship case. The Family Part terminated the parental rights of Robert's biological father, R.D.B. Daniel's biological father, M.N.M., surrendered his parental rights on May 8, 2019. These defendants are not a part of this appeal.

terminate A.O.J.'s parental rights after conducting a one-day trial in which she was not present nor represented by counsel.  We reverse.

The record shows A.O.J. complained to the judge about her inability to communicate with her attorney "for months."  The judge did not make any efforts to address or determine the validity of A.O.J.'s concerns.  Instead, the judge dismissed A.O.J.'s allegations outright and characterized the attorney as "one of the very, very best" attorneys who have appeared before her.  Without a formal motion supported by certification from the attorney or prior notice to A.O.J., the judge granted an oral application made by the attorney assigned by the Public Defender – Office of Parental Representation (OPR) to be relieved as counsel of record for A.O.J. in this guardianship trial.

The judge made clear to A.O.J. that the judiciary was powerless to interfere with the OPR's prerogative concerning the assignment of counsel.  In the judge's own words: "my hands are tied."  A.O.J. was left with only two options: (1) retain private counsel or (2) proceed without a lawyer.  Although the record reflects A.O.J. inquired about how to retain private counsel, this theoretical option was truly illusory.  The reality of her impecunious situation left her with only one untenable outcome, self-representation.

A-4795-18T1

At the time the judge granted the OPR counsel's oral request to withdraw as A.O.J.'s attorney of record in the case, the judge was well aware of A.O.J.'s lengthy history of dysfunctional behavior including alcoholism, prostitution, domestic violence, and homelessness. The judge allowed OPR counsel to abandon her client, leaving A.O.J. to proceed in this case without any legal guidance, and without making any findings about her intellectual abilities, educational background, and/or ability to comprehend the substantive and procedural aspects of this guardianship trial. Although the judge indicated on the record she would assign the previously relieved OPR attorney to act as A.O.J.'s standby counsel at the time of trial, this never came to pass.

Based on these uncontested facts, we are satisfied the Family Part violated A.O.J.'s constitutional and statutory right to be represented by competent counsel. The trial judge's response to A.O.J.'s dissatisfaction with her assigned OPR counsel is irreconcilable with the approach the Supreme Court established in N.J. Div. of Child Prot. & Perm. v. R.L.M. (In re R.A.J.), 236 N.J. 123, 149-51 (2018). We thus vacate the Judgment of Guardianship against her and remand this matter for a new trial.

4

# I

A.O.J. was born in 1994 and has an extensive history with the Division of Child Protection and Permanency (Division). She resided with her alcoholic grandmother as a child because of her mother's substance abuse problem. The Division eventually removed her from her grandmother's custody due to her grandmother's alcoholism. She resided with a foster family until she was old enough to leave on her own accord. She claimed the foster family members "were very violent" with her.

A.O.J.'s first encounter with the Division as an adult occurred on February 17, 2012, when she was pregnant with Robert. The Division intervened because she was not receiving prenatal care, was homeless, and was using marijuana. The Division caseworker who wrote the Screening Summary noted that A.O.J. "was kicked out of her mother's home on an unknown date and called a 'crack head' . . . [she] has no family or friends." A Division contact sheet dated May 2, 2012 reflected that A.O.J. was then residing at the Isaiah House, receiving $526 in food stamps, and purportedly receiving prenatal care from an OB/GYN physician in Clifton, whom she refused to identify by name. A.O.J. was approximately five months pregnant with Robert at the time. The Division closed the case on May 10, 2012. A.O.J. continued

A-4795-18T1

to reside at the Isaiah House until Robert was born. When she attempted to returned in late July 2012 following the birth of her son, she was prohibited from residing at Isaiah House. Division records document that the staff at Isaiah House reported A.O.J. "was constantly attacking other clients and staff as well as throwing chairs and causing other disturbances."

At the Division's request, Dr. Sonia Oquendo conducted a psychiatric evaluation of A.O.J. in January 2013. A.O.J. was nineteen years old at the time and her infant son Robert was five-months old. Dr. Oquendo noted that A.O.J. completed the tenth grade a few years earlier and was preparing to take her GED examination. Dr. Oquendo reviewed A.O.J.'s traumatic childhood, which included sexual abuse, abandonment, and two psychiatric admissions; the first occurred at age twelve when she was admitted at Beth Israel Hospital after she expressed suicidal ideations to a Division caseworker; the second incident occurred when she was fourteen years old and expressed a desire "to assault some girls who had jumped her and hit her with a machete."

Dr. Oquendo also noted A.O.J.'s substance abuse problem with marijuana, which began when she was fourteen years old as well as her family history of domestic violence. A.O.J. told Dr. Oquendo that she was arrested on two separate occasions; the first time was for physically assaulting her

A-4795-18T1

sister "after being coached by her grandmother." She was arrested a second time when she assaulted the school security guard who "embarrassed her and pinched her while she was attending school with an ankle bracelet."

Dr. Oquendo ended her psychiatric evaluation of A.O.J. with the following conclusions:

> [A.O.J.] has been exposed to multiple traumatic events during her life including physical abuse and sexual molestation. She exhibited multiple behavioral problems since an early age and was impulsive, aggressive, and assaultive. She was exposed to her mother's substance abuse and [her mother was] probably selling drugs in her house and she has a poor relationship with her mother. She learned to use aggression as a conflict resolution, which has created problems both at home, at school, and at a different placement that she has resided. She received poor prenatal care, but since the birth of her son she described significant changes in the way she acts and thinks. She is attached to her 5-month-old son and I had the opportunity to observe her interacting with him in a caring and an appropriate way.

Dr. Oquendo did not find a sufficient psychiatric basis to confirm a diagnosis of Bipolar Disorder for A.O.J. She opined, within a reasonable degree of medical certainty, that A.O.J. "does not need to be under the care of a psychiatrist and that treatment with medication is not indicated."

The Division's next encounter with A.O.J. occurred on September 4, 2014. In a Screening Summary, the Division's Local Office Permanency

7

Adoption Supervisor documented a telephone call made by A.O.J.'s biological mother who reported that A.O.J. had "housing issues" and she and her two children were residing with her. The Division supervisor also noted that A.O.J.'s mother "has an extensive history of substance abuse concerns and has not been [compliant] with services." The supervisor was particularly concerned because A.O.J. "has also left her children in the care of [her mother]." The supervisor ended the Screening Summary with the following observation: "No details are known in terms of a time frame or [A.O.J.'s] whereabouts. It is unknown at this time if [A.O.J.'s mother] has been under the influence of drugs while caring for the two children."

After further investigation, A.O.J. admitted to a Division caseworker that she and the children were temporarily residing with her mother, but she denied allowing her mother unsupervised access to the children. The children's biological fathers were both incarcerated at the time and did not provide any economic assistance to A.O.J. to defray the cost of their food and housing. Despite these financial difficulties, A.O.J. declined the Division's offer of assistance. The Division caseworker noted that "the home [was] free of clutter [and]. . . [t]here was food . . . and running utilities."

The Division caseworker received a report about the boys' medical condition. The physician did not find any known illnesses and concluded that A.O.J. was providing appropriate care. The medical report mentioned that the older boy Robert "is [a]sthmatic . . . [but] [h]is parent is providing appropriate care." The caseworker twice noted in the investigation summary: "There are no concerns of abuse or neglect."

On June 11, 2015, the Division received another referral alleging A.O.J. and her two sons had been "staying from place to place . . . for the past five months." The reporter claimed that A.O.J. and the children "were recently staying at the Riviera Motel . . . [until she] was put out[.]" The Screening Summary ended with the following disturbing statement: "[A.O.J.] is a prostitute. Reporter states the children are with her or other people while [she] works. Reporter was informed by someone that the children are also with [her] while she is prostituting; no details provided. [A.O.J.] smokes marijuana daily. The children are not in daycare and stay with [A.O.J.] during the day."

While the Division was investigating these allegations, on July 4, 2015, the East Orange Police Department responded to a physical altercation between A.O.J. and R.D.B., her oldest son's biological father. Division records show that both A.O.J. and R.D.B. were intoxicated at the time of the

altercation. According to the Division investigator who responded to the scene, A.O.J. was so impaired by alcohol that she "was not able to fully articulate what happened." R.D.B.'s aunt told the Division investigator that A.O.J. chased R.D.B. with a knife and threatened to kill him. The two boys were asleep during the altercation. A.O.J. told the investigator that R.D.B. instigated the altercation; she denied striking him or threatening him with a knife. The police officers who responded to the scene arrested both A.O.J. and R.D.B.

On July 4, 2015, the Division executed an emergency removal of the children without judicial authorization pursuant to N.J.S.A. 9:6-8.29 and placed them into a resource home. On July 7, 2015, the Division filed an Order to Show Cause (OTSC) for Temporary Custody and a Verified Complaint to Appoint a Law Guardian with Temporary Custody. On this day, the judge, who managed this case from its inception through the final guardianship trial, granted the Division's petition for temporary custody of the children. The judge found sufficient grounds to remove the children from A.O.J.'s care and custody, thereby avoiding imminent danger to the children's life, safety, or health. The judge made the following factual findings in

support of this decision based only on the events described by the Division in the Verified Complaint:

> [I]t would not be safe for the minors, [Robert] and [Daniel] to remain in the care of their mother [A.O.J.] . . . [because she] was involved in a domestic violence incident with her paramour, [R.D.B.], and allegedly threatened to kill him with a knife. [A.O.J.] was subsequently arrested and charged with terroristic threats to kill, and simple assault. [R.D.B.] is the father of [Robert]. [R.D.B.] is on parole in New York and resides with his aunt, and needs to be further assessed to determine if he is an appropriate caretaker for his son. [M.N.M.] is the putative father of [Daniel]. [M.N.M.] is currently incarcerated at Essex County Detention Center.

The Division thereafter relocated the children to a new resource home where they remained until December 18, 2015.

A.O.J. completed a 5A form and was found financially eligible to be assigned counsel by the OPR. The attorney that the OPR assigned to represent A.O.J. appeared on her behalf in all subsequent hearings and case management conferences, until the court granted her oral application to be relieved from this responsibility on February 7, 2019. A.O.J.'s OPR counsel first appeared on the return date of the OTSC on July 29, 2015 and was present on A.O.J.'s behalf during the case management conferences held on August 14, 2015 and October 1, 2015. This attorney represented A.O.J. at the fact-finding hearing

11

held on November 13, 2015. At the conclusion of this hearing, the judge found the Division did not prove, by a preponderance of the evidence, that A.O.J. had abused or neglected her sons on July 4, 2015, as defined in N.J.S.A. 9:6-8.9(d). The judge ordered the Division to remove from its records the "established" finding of abuse and neglect against A.O.J. and replace it with "[n]ot [e]stablished" or "unfounded" based upon the court's ruling. The judge found, however, that the evidence showed a need to continue the Family Part's jurisdiction under N.J.S.A. 30:4C-12 based on the need for the Division's services due to A.O.J.'s "housing instability, alcohol use, and history of prostitution."[3]

On September 18, 2015, the Division arranged for A.O.J. to be evaluated by Catholic Charities to determine what type of services she needed to organize her life and regain custody of the children. The appellate record contains several assessment reports from this philanthropic agency. An assessment dated June 29, 2016 includes A.O.J.'s account of the severe, psychologically traumatic events she experienced as a child. She reported that

---

[3] N.J.S.A. 30:4C-12 "provides the means for the Division to effectuate services to children in need when a parent does not consent to the Division's supervision, care, or custody." N.J. Div. of Youth & Family Servs. v. I.S., 214 N.J. 8, 33 (2013).

she was sexually assaulted three times between ages twelve to fourteen years old. The first sexual assault was perpetrated by an adult male cousin. The other two sexual assaults were committed by strangers. According to A.O.J., when she told her grandmother and mother about these incidents of sexual violence, they both told her "it was good for her to have that experience." A.O.J. also told the counselor who conducted this assessment that she intentionally "buried" or consciously repressed these traumatic childhood experiences because of the response she received from her family. The counselor specifically noted that "she blamed herself for being raped." The Catholic Charities assessment report concluded that A.O.J. needed "mental health counseling for her past sexual traumas and her domestic violence."

On November 13, 2015, more than three months after the children's emergency removal, the Division's case manager assigned to coordinate the services ordered by the Family Part met with A.O.J. The Division Contact Sheet entered that same day documented the following difficulties:

> [A.O.J.] indicated she has started with her substance abuse treatment. Case manager accompanied her to the Family Justice Center for domestic violence. Case manager expressed the difficulty with finding services for [A.O.J.] due to [her] being the batterer. Case manager also indicated that the other batterer is currently incarcerated and she wanted to leave the state. Case manager was advised that [A.O.J.] can

13

receive assistance from the Victims Witness Compensation program. It was stated they can supply the first month's rent and security. Case manager also provided her with a list of agencies that provide batterers intervention counseling. Case manager and [A.O.J.] left the facility.

A Contact Sheet entered by the case manager on November 16, 2015 shows that the only domestic violence services the Division provided considered A.O.J. the batterer-aggressor, not the victim. Because the police officers who responded to the scene considered A.O.J. and R.D.B. equally culpable combatants, the Division labeled her a "domestic batterer" before she was even arraigned on these charges.

Although the dispositive legal issue here is the wrongful denial of counsel to A.O.J. during the guardianship trial, we will summarize A.O.J.'s efforts to remain in contact with the children during the time leading to the trial. Both children received a Comprehensive Health Evaluation conducted at Saint Barnabas Children's Hospital on August 14, 2015. Daniel was nearly one-and-a-half years old at the time. The report found his "gross and fine motor skills, problem-solving skills and personal-social areas of development were in the normal range," when compared to other children his age. However, his "communication, social and emotional skills" were at-risk. The

14

report recommended "a comprehensive speech evaluation to address his reported and observed speech delays."

Robert was three-years old at the time of his evaluation. Although his physical development was within the normal range when compared with children his age, the physicians found he "has issues with calming himself down, using words to describe feelings, and destroying toys and food on purpose." His behavior and responses to questions during the evaluation affected his ability to function and appeared to be related to his language delays.

A Monthly Progress Report filed for the time period between October 5, 2016 and November 5, 2016 indicated the children experienced difficulties acclimating to their foster home. Robert in particular did not "seem fully comfortable in his living situation because of the fear he has for his foster parent." (Emphasis added). While at home with his foster parent, Robert was "quiet and [sat] very still . . . [He] seems very intimidated by his foster mother." (Emphasis added). The foster parent reported that she had received "many phone calls" from the school Robert attended "about him acting out and being out of control." We note these dysfunctional displays seem consistent

with the concerns identified by the physicians who evaluated the boys at Saint Barnabas Children's Hospital.

On May 25, 2017, the Division placed the children in a different foster home. A Division Contact Sheet documented that the location of the new foster home allowed A.O.J. to visit the children on a weekly basis and enabled Robert to receive in-home therapy. The documentary evidence also shows the Division was no longer pursuing family reunification. The Contact Sheet indicated the Division's goal was "select home adoption." At this same time the Division approved the boys to visit Daniel's aunt and uncle in the State of Georgia. The couple told the Division they wanted to adopt both boys. The uncle said he was a former professional baseball player with the Atlanta Braves who retired in 1996.

On October 18, 2016, the Division filed a complaint for guardianship to terminate A.O.J.'s parental rights to Robert and Daniel. Coincidently, however, A.O.J. began to make significant progress and established a steady record of compliance with court-ordered services. The Division was so impressed with A.O.J.'s efforts following the filing of the guardianship complaint that it petitioned the judge to change the plan from termination to reunification.

A-4795-18T1

On September 7, 2017, the judge approved the Division's permanency plan for reunification with the following caveat:

> [A.O.J.] has been compliant with services and may soon be able to care for the children independently. However, she still does not have housing and needs to demonstrate stability before the children can be placed in her care. Dr. Singer completed an updated evaluation of [A.O.J.] which recommended that she work toward reunification, but that she still needs to be monitored by a psychiatrist, continue participating in therapy, complete her substance abuse treatment, and obtain stable housing and employment.

The judge acknowledged the Division had provided reasonable services to bring about a reunification plan that provided A.O.J. with "substance abuse treatment, therapy, parenting skills, board rate, [and] relative assessments." The judge thus dismissed the guardianship complaint and "reopened" the proceedings under N.J.S.A. 30:4C-12. The order contains twelve numbered items that the judge deemed worthy of clarification. Of particular relevance here, item number eleven states: "Both [A.O.J.] and [Daniel's biological father, M.N.M.,] have completed 5As and have been approved for counsel in [the] FN [Title 30 case]."

A.O.J.'s efforts to maintain a positive lifestyle proved to be short lived. In an order dated September 6, 2018, the judge found A.O.J.: (i) had not received individual therapy despite a history of mental health issues; (ii) did

17

not comply with ongoing screening for substance abuse, including hair follicle tests; (iii) failed to sustain stable housing and secure suitable employment to cover her living expenses; and (iv) repeatedly arrived late to scheduled visits with the children. Conversely, the Division provided her with "psychological and psychiatric evaluations, parenting skills training, supervised visitation, drug testing, board rate, Medicaid, furniture, clothing, car seats, foster care support services, psychosocial evaluation, therapy and behavioral assistance services."

The judge rejected the Division's request to allow A.O.J. additional time to comply with services and ordered the Division to present a new permanency plan on October 2, 2018. On the return date, the Division again argued in favor of allowing A.O.J. additional time to show her fitness to parent her sons. The judge again rejected the Division's plan and rescheduled the matter for November 1, 2018. After again finding no basis to provide A.O.J. with any additional time to comply with the court-ordered services, on November 14, 2018, the judge ordered the Division to submit a permanency plan to terminate A.O.J.'s parental rights and proceed with adoption. In an order dated January 8, 2019, the court also terminated the protective services litigation.

## II

On January 15, 2019, the Division served A.O.J. with a Verified Complaint for Guardianship and an Order to Show Cause (OTSC). She completed a 5A form, was found eligible to be represented by the OPR, and assigned the same attorney who represented her in the previous Title 9 and Title 30 cases. The same judge who adjudicated these two previous cases was assigned to manage and preside over this second guardianship action.

### February 7, 2019 - Case Management Hearing

The record shows the presence of the Deputy Attorney General (DAG) for the Division, the Law Guardian on behalf of the children, A.O.J., and an OPR attorney, who indicated she was "provisionally representing" Daniel's biological father, M.N.M. Robert's biological father, R.D.B., was not present. The transcript of the case management conference shows A.O.J.'s OPR attorney was present but did not enter her appearance on behalf of A.O.J. nor make any attempt to apprise the judge that she was having problems with her client since the termination of the protective services litigation.

As the following colloquy shows, the DAG was the first to inform the judge about this controversy on the record.

A-4795-18T1

DAG: [A.O.J.] has been served and completed a 5A, although it's our understanding she no longer wishes to have [OPR counsel] represent her.

THE COURT: [addressing A.O.J.] Unfortunately, I can't – one, you're assigned counsel, if there's a problem with that counsel, they will not reassign you another counsel and I can't make them reassign you a counsel.

Yes?

. . . .

[A.O.J.]: Since for months, months, I mean I've been having complaints, I've let my caseworkers know, I let the Judge['s] Chambers know, I mean, I've been getting so much help, more from my [Division] worker, it's like I feel like my [Division] worker is my attorney, I can't even get in contact with her, let alone get a [c]ourt date or nothing.

THE COURT: All right. This is all I can tell you. This is what I can tell you, [A.O.J.] I have a lot of attorneys [who] appear before me, a lot, and clearly, [OPR counsel] is really one of the very, very best. So it is unfortunate that you feel the way you feel.

[T]he rules are very clear, you get one attorney assigned to you. If . . . for whatever reason, you do not like that attorney, you cannot get along with that attorney, I cannot order O.P.R. to provide you with other counsel. That is not something I can do. <u>I encourage you to try and get counsel on your own but there is nothing . . . my hands are tied. There is not much else I can do</u>.

[A.O.J.]: Okay.

THE COURT: <u>But I would suggest strongly that you obtain counsel</u>.

[Addressing A.O.J.'s OPR counsel]

Now . . . you're -- O.P.R. was not assigned in -- you were assigned in the FN[?]

[A.O.J.'S OPR COUNSEL]: Yes, they were.  In both, so we're asking for the [c]ourt [to] [relieve] me in regard to that.

THE COURT: All right. And [A.O.J.], you do not wish to have [OPR counsel] represent you, correct?

[A.O.J.]: No.

THE COURT: Okay. Then [OPR counsel] you're . . . relieved.

[(Emphasis added).]

The record shows that from this point forward, the judge interacted with A.O.J. directly and without legal representation.  This left A.O.J. bewildered and frustrated.  Furthermore, the judge continued to admonish her to retain private counsel, knowing full well this was not a realistic option for this economically impoverished, socially unsophisticated young woman.  The colloquy between A.O.J. and the judge illustrates this point:

THE COURT: [A.O.J.] . . . you were given a path that you had to follow . . . to get . . . to have this case stay in protective litigation and to get your children back, you didn't follow it, I'm sorry.  I'm sorry.  So now . . .

21

we're in guardianship, you're going to be offered . . . services, I suggest you follow them, you do what I'm ordering you to do and . . . then we'll make a determination going forward. You have the opportunity to visit, I suggest you take advantage of it.

[A.O.J.]: Oh, I always . . . see my children even –

THE COURT: Okay.

[A.O.J.]: even times that they said that I wasn't.

THE COURT: Okay.

[A.O.J.]: Could you ask [the Division caseworker] about the times that she found out that –

THE COURT: No, I can't.

[A.O.J.]: You can't.

THE COURT: I ruled – I've already ruled on that, you were given opportunities –

[A.O.J.]: From false information.

THE COURT: [A.O.J.], you were given opportunities, you were supposed to be going to visitation through the program and you didn't.

[A.O.J.]: I was sick and I cannot see my children when I'm sick.

THE COURT: Well . . . it was months, it was months –

[A.O.J.]: It was not months.

22

THE COURT: -- I'm not going to – thank you, that's done. I'm not going to hear any more. You have a path, you know what you have to do, <u>I suggest – strongly suggest you obtain counsel</u>. All right. Now, is there anything that you – do you have any questions?

[A.O.J.]: <u>So do you have any information on lawyer services that I can get because I'll pay for them if I have to</u>.

THE COURT: <u>We'll provide – I'll provide you with a list if you wait outside</u>.

[A.O.J.]: Has anybody put – research and investigate everything was not accurate.

THE COURT: Okay.

[A.O.J.]: But a real lawyer will definitely get that done.

[(Emphasis added).]

At the conclusion of the case management hearing, the judge entered an order dated February 7, 2019 that provided A.O.J. telephonic visitation with her two sons on Saturdays at 11:00 a.m., which would be "supervised by the resource parent." The judge further ordered that the attorney assigned to represent A.O.J. by "the Office of the Public Defender/Office of Parental Representation [is] hereby relieved." The appellate record does not show that anyone associated with the judiciary provided A.O.J. with "a list" of attorneys for her to retain.

The transcript of this hearing shows the DAG, the Law Guardian, and the OPR attorney assigned to represent M.N.M. entered their appearance before the court. Neither A.O.J., R.D.B., nor M.N.M. were present. The judge made the following statement at the start of the hearing:

> All right. I just wanted to put on the record that [A.O.J.] had in the past, <u>fired her court-appointed counsel, she was advised and she advised the [c]ourt that she would get her own private counsel</u>, the [c]ourt's received nothing with respect to any representation for her. [R.D.B.] was provided with a 5A application that he did not complete, however, at least the [c]ourt has not received it.
> [(Emphasis added).]

The DAG advised the judge that the children were still residing in Georgia in a licensed resource home. The DAG also apprised the court that the Division was willing "to pay for monthly visits for [A.O.J.] to get to Georgia, however, she did not attend her visit that was previously scheduled for February 19th, [2019]." The DAG stated that the Division remained willing to provide her with the means to see the children and the caseworker planned to speak to her "to try to arrange a March visit." The Division had also scheduled a psychological and bonding evaluation for A.O.J. on April 1, 2019. The children and the resource parents were coming that same day from

24

Georgia for a bonding evaluation. The DAG also summarized other services the Division had arranged for A.O.J., such as counseling at the Family Life Education Center. The DAG confirmed that A.O.J. provided the Division with a rent receipt at the last hearing. However, she still had not provided a copy of the lease or proof of employment.

The Law Guardian questioned Division caseworker Adrienne Caldwell to ascertain the type of services the Division was providing to the children. Caldwell testified that "[a]t this time, there's no services in place." The Law Guardian advised the judge that she planned to travel to Georgia "in the coming weeks and/or months." At the conclusion of this case update, the judge addressed the attorneys to select a single day to try the case. This prompted the following statement by the court:

> THE COURT: I'm only . . . nobody is telling me they have experts, I have two defendants [R.D.B. and A.O.J.] that don't have lawyers, so yeah, I'm looking at one day. That could change but I'm -- and I'm not adjourning this. So if anybody thinks they're going to get an expert, they better get an expert.
>
> [(Emphasis added).]

The judge scheduled the trial to start at 1:30 p.m. on April 9, 2019.

A-4795-18T1

## April 9, 2019 - Case Management Hearing

The trial did not take place on this date. Instead, at the outset of the hearing, the DAG advised the judge that the Division caseworker "notified [A.O.J.] this morning that the hearing was going to be today, she said she's at work but she would also like to appear by phone if possible." The Division caseworker was also appearing via telephone. After overcoming the logistical difficulties associated with the telephonic participation of witnesses, the DAG again summarized the status of the bonding evaluations and, through the court, asked A.O.J. "to contact the Division to coordinate a visit in person with the children in Georgia for the month of May 2019."

The DAG claimed A.O.J. had not contacted the Division to coordinate visiting the children during the months of February and March and had not been "consistent" in her attempts to contact the children telephonically during the same time period. According to the DAG, A.O.J. had not participated with the services offered by the Division and, on the issue of stable housing, continued to provide only rent receipts instead of a lease.

After the DAG concluded her summary report, the judge addressed A.O.J. directly and urged her to secure the necessary proofs regarding housing

A-4795-18T1

and steady employment.  The judge then again addressed A.O.J. on the issue of retaining an attorney:

> THE COURT: And [A.O.J.] I'm going to tell you this again, I really think you should have counsel in this matter.  I've said this to you every time you've appeared in [c]ourt, I said to you at the end of the last -- you know, if you need [addressing the attorney assigned to represent M.N.M.] . . . is it possible, does the Division – I'm sorry, does O.P.R. have a list of outside counsels?
>
> [ATTORNEY FOR M.N.M.]: No.
>
> [A.O.J.]: Actually I would – I definitely I would agree to the (indiscernible). I listen to (indiscernible) in my schedule of work right now when I work and thank God, I was able to get (indiscernible) probably would have missed it.
>
> THE COURT: All right. I . . . realize this is difficult but June 2nd is going to be here very soon and I'm –
>
> [A.O.J.]: Yes.

The judge entered a case management order dated April 10, 2019 that contained twelve items or matters that needed to be addressed before the start of trial.  Item number five stated: "[A.O.J.] was encouraged by the [c]ourt to retain counsel to represent her in this matter."  The judge scheduled the next "Case Management Review on May 13, 2019, at 2:30 PM."

Five days before the May 13, 2020 case management review hearing, the judge held a hearing to consider appointing A.O.J.'s original OPR attorney as standby-counsel in the guardianship trial scheduled to start in June 2019. The transcript of this impromptu hearing shows only the DAG, Division caseworker Latoya Mannon, and the Law Guardian were identified as present. A.O.J. was not physically present and the judge did not take any steps to arrange for her to participate telephonically. It is not clear from this record whether A.O.J. was given prior notice of the hearing. The judge began the hearing with the following prefatory remarks:

> I called everyone here today on short notice because I had some real concerns about [A.O.J.] and her representation in this trial -- at trial. When we were first here -- well, let me see, I believe it was February 7th [2019] when we were here to dismiss the -- let me just -- let me -- let me start at the beginning.

From this point, the judge recited at length the procedural history of A.O.J.'s involvement with the Division and the judiciary, which have been described at length herein. The judge particularly referred to A.O.J.'s status as a self-represented litigant in this guardianship case and made the following statement about how this came to be:

THE COURT: When we appeared in [c]ourt on February 7th on the FG, [A.O.J.] was quite insistent that -- well, she felt that she had not been listened to in the FN, she believed that -- she filled out a 5A, was advised that [OPR counsel], her counsel since 2015, would continue to represent her and she was quite upset about that. She made it very clear she did not want [OPR counsel] to represent her. It was also made very clear to her that once she completes a 5A, she is assigned counsel. She does not have the opportunity to select counsel. At that time she said she would -- wanted to get outside counsel.

[The judge stopped her comments at this point to acknowledge the presence of the OPR attorney who represented M.N.M. in this guardianship case and requested counsel to enter her appearance on the record. The judge thereafter immediately resumed her recitation.]

THE COURT: Okay. We were just going forward because I wanted to put things on the record about [A.O.J.], that's why we started without you.

At that time, I . . . strongly encouraged her to retain counsel to represent . . . herself in this matter. I explained . . . the seriousness of the subject matter, I explained again that O.P.R. counsel -- that you could not select your O.P.R. counsel, she was advised that -- she advised the [c]ourt she did not want [OPR counsel] to represent her. I, at that point, [OPR counsel] and the Office of Parental Representation was relieved of their responsibilities in this matter. She did state at the time that she would obtain outside counsel.

She did not appear but brought this matter back on March 5th [2019]. She did not appear in [c]ourt. The

29

[c]ourt noted again that defendant had -- that I received nothing from the defendant with respect to representation of any kind.

On [April 10, 2019] she appeared telephonically, the [c]ourt again stressed that she should retain counsel in this matter. The [c]ourt has continually noted that there would be no final -- no additional adjournments of this trial. The trial was scheduled I believe for June 3rd. Considering the length of time these children have been in -- in the Division's custody, made it very clear there would be no adjournments of the trial date.

As of this date, in light of -- in light of what had happened, I wanted the Division to reach out to [A.O.J.]. I wanted her to appear in [c]ourt today. She never told me she wanted to represent herself, which is her right, nor did she say that she was going to have -- fill out a form for O.P.R. I have [OPR counsel] here because I was prepared to have [OPR counsel] assigned to her as stand-by counsel.

[(Emphasis added).]

At this point, the judge asked the DAG to place on the record what efforts the Division had made to contact A.O.J. "since I issued this order and I believe we scheduled this matter about a week ago." The DAG responded as follows:

In brief, Your Honor, Ms. Mannon did text message with [A.O.J.]. She responded, at least initially, that she eventually wanted [her original OPR attorney] back however, I don't believe Ms. Mannon has spoken with her. Ms. Mannon went to her house several times to try and make personal contact with her including

30

this morning. Ms. Mannon had scheduled the C.A.D.C. for today at 10:00 a.m. before this hearing. She did not attend either.

Caseworker Mannon also described in detail her exchange of text messages with A.O.J. regarding services arranged by the Division on May 1 through May 6, 2019. The record shows that at 11:36 a.m., the judge telephoned A.O.J. from the bench, but the call was answered by a recording indicating that the voice-mailbox was full. At this point, the judge addressed A.O.J.'s original OPR attorney.[4]

> THE COURT: [addressing A.O.J.'s original OPR attorney] I'm not going to appoint you as stand-by counsel today. I . . . you know, I'm trying to work with mom, she's not here, if she appears, I know that was going to be over the objection of your office. I know that she's not completed a 5A[.] I understand that . . . it puts you certainly in a difficult position, you being your office, and that's not to say, if she appears at some point perhaps I will do it –
>
> [OPR COUNSEL]: Right.
>
> THE COURT: -- but I need her -- I need her to at least show up.
>
> [OPR COUNSEL]: And apparently, all we need is a court order for stand-by counsel, that's it.
>
> THE COURT: <u>Yes and I was prepared -- I was absolutely prepared to do that today but I'm not going</u>

---

[4] This is the first time the record reflects the presence of the OPR attorney.

to appoint stand-by counsel to her if I can't get her in [c]ourt. All right? I mean, if she appears, I very well may do it, I will call you immediately. I'm going to -- this matter is scheduled for – I'm going to keep this on for Monday, [May 13, 2019,] [and] see if -- that was another date that she was advised of, if she appears, I will call you and I'll let you know but if she fails to appear in [c]ourt, I'm not going to go through – I'm not going to make you go through that if there's nothing for you to do, if she's not going to cooperate at all. All right.

[OPR COUNSEL]: I'm going to wait a few more minutes.

THE COURT: Okay. Thank you.

<u>May 13, 2019 - Case Management Conference</u>

The record shows that the only individuals who attended this case management conference were the DAG, the Law Guardian, and Division caseworker Mannon. The DAG advised the judge that the resource parents maintained monthly logs of A.O.J.'s telephone contacts with the boys, including text messages. Mannon was sworn in and testified about the information contained in the logs. The DAG also represented that both boys had been evaluated for sexual trauma at the Medlin Treatment Center in Georgia. The visitation telephone logs and psychological evaluation reports dated March 15, 2019 were e-filed.

The judge confirmed on the record that the guardianship trial would start on June 3, 2019. The DAG informed the court the only two witnesses the Division would call at trial were caseworker Mannon and the psychologist who conducted the bonding evaluations. The judge made the following statement:

> All right. I just want you to be able to put on the record in detail all the efforts you've made to try and get [A.O.J.] recently. I mean, it's just . . . needless to say I'm very upset about it because . . . we've been trying to give her counsel and trying to get -- trying to have some help for her and it's just – she's just sabotaging herself, she's sabotaging any effort she might have had to . . . salvage this.

### June 3, 2019 - Guardianship Trial

The guardianship trial began and ended on June 3, 2019. A.O.J. did not attend the trial nor did her original OPR attorney, whom the judge previously indicated would likely attend the proceedings as A.O.J.'s standby counsel. The judge telephoned A.O.J. from the bench at the start of the trial. The record shows the judge reached A.O.J. at work. When the judge asked her if she intended to attend the trial, A.O.J. responded that she had "two jobs back to back" and was not aware of the date of the trial. The following colloquy relates directly to the question of whether A.O.J. received prior notice of the trial date:

THE COURT: I'm sorry, I am giving you no – I've made it very clear to you what day this was and that I was not going to adjourn this matter.

[A.O.J.]: I did not get no date.

THE COURT: I told you the day. I told you the day --

[A.O.J.]: You -- okay –

. . . .

[A.O.J.]: I'm doing an overnight shift --

THE COURT: I'm sorry.

[A.O.J.]: -- and someone couldn't call me –

THE COURT: Ms. Mannon has been trying to call you, you've blocked her calls.[5]

---

[5] There is no competent evidence that A.O.J. blocked caseworker Mannon's calls. The only competent evidence shows A.O.J.'s voice-mailbox was full at the time Mannon called her. The only reference in the trial record that A.O.J. blocked Mannon's telephone calls is in the form of the following incompetent hearsay testimony from Mannon:

DAG: Now, how would you describe her responsiveness with phone calls and text messages currently?

A. I don't have a way of communicating with her since May 2nd [2019] was the last time I spoke to her via text only and since May 15th [2019], I asked my colleague to swing by her house and at 11:30 in the morning, she was at home and she advised my colleague that she had

[A.O.J.]:  . . . I spoke with Ms. Mannon's supervisor that I would like somebody else to call me and talk to me because . . . every time I speak to Ms. Mannon . . . [she] is very rude and I mentioned that numerous amount of times.

.  .  .  .

And it seems like, never listens to no complaint, everything I say which I was listening to everything they saying and when I need someone to reach out to, I don't have no one to reach out to . . . I don't have no attorney, they're either the Division or their side – I'm telling this lady, I'm tired of being disrespected, I'm working two jobs, you have your job, I gotta [sic] work to pay for myself.  I can't be disrespected by the agency and not even represented by -- sit down and talk to me.

[(Emphasis added).]

At this point, the "court officer" administered A.O.J. the oath required under N.J.R.E. 603 over the telephone.  The judge thereafter addressed A.O.J. directly.  This exchange quickly degenerated into an exchange of accusations between the judge and A.O.J.  The judge retraced the procedural history of

blocked my number.  So I don't have a way of communicating with her via phone anymore.

Q. To the best of your knowledge, do you still remain blocked on her telephone?

A. Yes because she still hasn't responded to my texts or my phone calls.

35

A.O.J.'s involvement with the Division and the court from 2015 to June 3, 2019, the date of trial. The judge claimed that A.O.J. had been uncooperative and unwilling to communicate with the Division's caseworkers, and the court repeatedly admonished A.O.J. that the court would hold the start of the trial only until 10:30 a.m., giving A.O.J. fifteen minutes to report to court.

A.O.J. vehemently disputed the judge's claims that she had been uncooperative and emphasized that she worked two jobs to support herself. A.O.J. alleged the Division's caseworkers had been rude and disrespectful. She ended this heated exchange by noting it was impossible for her to report to court in fifteen minutes. The record shows the discussion between the judge and A.O.J. came to an abrupt end as follows:

> THE COURT: I'm giving you 15 minutes to get down here. Thank you.
>
> [A.O.J.]: Hum.
>
> THE COURT: We're going to hold 15 minutes.
>
>      . . . .
>
> MS. MANNON: Address where she's at, see if I can try to get someone to -- if she can't get here by herself.
>
> THE COURT: I just called her. I hung up on her. She hasn't told us yet where she – We're going to hold this case [until] 25 minutes of 11:00. If you want to try

36

and reach out to her again or have [the DAG] text her,
that's fine, but I am not holding this trial up today.

The guardianship trial proceeded without the biological mother and without an attorney to represent her. The Division presented the testimony of psychologist Dr. Elizabeth Stillwell. The Law Guardian stipulated to Dr. Stillwell's expertise as a child psychologist. She testified on the question of bonding. The Division's only other witness was caseworker Mannon. Before Mannon took the stand to testify, the DAG advised the judge that Mannon received a message from her supervisor about A.O.J. The DAG was not certain whether A.O.J. had called back or the Division reached out to her. Regardless of which one initiated the contact, the DAG indicated that "there was a conversation about whether or not [A.O.J.] still wanted to appear." According to the DAG, A.O.J. allegedly "hung up without saying whether or not she wanted to come[.]" The DAG offered to call the Division supervisor to testify about what was actually discussed. Alternatively, the DAG suggested the judge call A.O.J. on the phone.

The judge declined to call A.O.J. but confirmed that the Division had offered A.O.J. transportation. The judge declared a five minute recess to permit the Division to contact A.O.J. The court recess lasted from 11:30:48 a.m. to 11:50:55 a.m. When the trial resumed, the DAG apprised the judge

that Mannon's supervisor, Adrienne Caldwell, was present in court and ready to testify about her conversation with A.O.J. The judge asked Caldwell, who had been previously sworn as a witness, "to briefly tell us . . . is she coming or isn't she?" Caldwell responded that despite her repeated requests for an answer, A.O.J. did not definitively answer that question. Caldwell made clear, however, that she told A.O.J. the Division would pick her up and transport her to the courthouse. The conversation ended when the telephone was disconnected. The judge concluded that A.O.J. had been given sufficient time to arrive and participate at trial.

### III

In this appeal, A.O.J. argues that the Family Part violated her constitutional and statutory right to counsel when the court relieved her assigned OPR attorney and terminated her parental rights to her sons in absentia, in an ex parte, non-adversarial trial. A.O.J. acknowledges that an indigent defendant who applies for representation from the OPR does not have the right to select her attorney. However, she maintains that a trial judge is ethically obligated to consider and determine whether a defendant's allegations of attorney malfeasance are reasonably grounded.

38

A.O.J. argues that she presented good cause for the judge to act because her attorney failed to communicate with her and did not keep her informed about the status of the case.  Thus, A.O.J. claims the Family Part erred when it dismissed her allegations against the OPR attorney without engaging in any due diligence and allowed her to proceed without legal representation and without making any inquiries to determine if A.O.J.'s impromptu decision "to fire" her attorney constituted a knowing and intelligent waiver of her constitutional and statutory right to counsel.

The Division's sixty-five-page brief in this appeal devoted the last three pages to address A.O.J.'s arguments attacking the viability of the judgment of guardianship based on a violation of her right to counsel.  The Division argues that A.O.J.'s arguments "do not merit exhaustive discussion" because "there is no indication in the record" that she made these arguments before the trial court.  Therefore, "for that reason alone, these arguments should be ignored by this court."

The Law Guardian's brief adopts a similarly dismissive legal posture.  According to the Law Guardian, A.O.J. "was advised of the importance of obtaining counsel and provided with lists of legal resources on several occasions."  Even more disturbing, the Law Guardian cites to a section in the

Forensic Psychological And Bonding Evaluations report authored by Dr. Stillwell to make the following assertions:

> [A.O.J.] offered no evidence that she called the Office of Parental Representation to file a complaint, or took steps to retain new counsel from the list of resources provided to her. Dr. Stillwell opined that [A.O.J.] externalized blame onto others. [A.O.J.'s] assertions that her attorney was responsible for her bad outcomes appeared to fit this pattern. [A.O.J.'s] attorney met her responsibility under R.P.C. 1.4; any failure to communicate was on the part of [A.O.J.].

We start our analysis by describing the fundamental principles that must guide a trial judge's decision to permit a parent to proceed pro se in a guardianship trial to terminate the parent's parental rights to his or her children. "Parents in New Jersey charged with civil abuse and neglect under Title Nine or who are subject to Title Thirty termination proceedings have a constitutional right to counsel under the due process guarantees of Article I, paragraph 1 of the State Constitution, and a statutory right under N.J.S.A. 9:6-8.43(a), 9:6-8.30(a), and 30:4C-15.4(a)." N.J. Div. of Child Prot. & Permanency v. G.S., 447 N.J. Super. 539, 555 (App. Div. 2016) (citing N.J. Div. of Youth & Family Servs. v. B.R., 192 N.J. 301, 305 (2007); N.J. Div. of Youth & Family Servs. v. E.B., 137 N.J. 180, 186 (1994); Crist v. N.J. Div. of Youth & Family Servs., 135 N.J. Super. 573, 576-77 n.2 (App. Div. 1975)).

N.J.S.A. 30:4C-15.4a provides:

> a. In any action concerning the termination of parental rights filed pursuant to [N.J.S.A. 30:4C-15], the court shall provide the respondent parent with notice of the right to retain and consult with legal counsel. If the parent appears before the court, is indigent and requests counsel, the court shall appoint the Office of the Public Defender to represent the parent. The Office of the Public Defender shall appoint counsel to represent the parent in accordance with subsection c. of this section.
>
> If the parent was previously represented by counsel from the Office of the Public Defender in a child abuse or neglect action filed pursuant to chapter 6 of Title 9 of the Revised Statutes on behalf of the same child, <u>the same counsel, to the extent practicable, shall continue to represent the parent in the termination of parental rights action, unless that counsel seeks to be relieved by the court upon application for substitution of counsel or other just cause.</u>
>
> Nothing in this section shall be construed to preclude the parent from retaining private counsel.
>
> [(Emphasis added).]

Writing on behalf of a unanimous Court, Chief Justice Rabner recently reaffirmed the importance of the right to representation in the context of litigation effecting the parent/child relationship:

> Without the assistance of counsel to prepare for and participate in the hearing, the risk of an erroneous outcome is high. It is hardly remarkable to note that a parent who is a layperson faces significant challenges

if she appears on her own to contest a private adoption proceeding. The issues are not simple. They may involve complicated, expert medical and psychological evidence. An indigent parent who has no legal training will not know how to work with a psychologist to prepare for a trial or how to cross-examine the other side's expert. She will have a hard time developing defenses, gathering evidence, presenting a case, and making arguments to address the relevant legal standard. A parent without a background in evidence law will also likely be unable to prevent opposing counsel from introducing hearsay or other inadmissible testimony.

[In re Adoption of J.E.V., 226 N.J. 90, 109 (2016) (internal citations omitted).]

This is particularly relevant in cases in which the Division seeks to terminate the parental rights of indigent parents:

[T]he need for counsel in a parental termination case is evident in light of the nature of the right involved; the permanency of the threatened loss; the State's interest in exercising its parens patriae jurisdiction only where necessary; and the potential for error in a proceeding in which the interests of an indigent parent, unskilled in the law, are pitted against the resources of the State.

[B.R., 192 N.J. at 306 (emphasis added).]

Although parental rights are part of a select number of legally protected rights that make up the core of our humanity, these rights are not absolute. In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999). The rights of a parent to

rear her or his children must be balanced against the "State's parens patriae responsibility to protect the welfare of the children." Id. at 346. Nearly six months before the start of this guardianship trial, our Supreme Court addressed, as a matter of first impression, "whether a parent has the right to represent himself or herself in an action to terminate parental rights pursuant to N.J.S.A. 30:4C-15 to -20." R.L.M., 236 N.J. at 131. In responding affirmatively to this question, the Court reaffirmed our State's "longstanding adherence to the principle that a competent litigant may represent himself or herself in a matter in which he or she is a party, subject to exceptions set forth in statutes, court rules, and case law." Ibid.

Thus, the Court in R.L.M. held that the right to be represented by competent counsel in a termination of parental rights proceeding "is constrained by two important considerations: the Family Part judge's responsibility to reach an informed and fair determination of the child's best interests, and the child's interest in permanency." Id. at 149. The Court also noted that "[a]lthough a parent's decision to appear pro se in this complex and consequential litigation represents poor strategy in all but the rarest case, N.J.S.A. 30:4C-15.4 plainly authorizes that parent to proceed unrepresented." Id. at 131-32. Mindful of these misgivings, the Court articulated the following

43

admonition to dispel any lingering doubt about how a Family Part judge must

respond to a parent's invocation of her or his right to self-representation:

> The parent's right of self-representation, however, is by no means absolute. That right must be exercised in a manner that permits a full and fair adjudication of the dispute and a prompt and equitable permanency determination for the child. The parent must inform the court of his or her intention to appear pro se in a timely manner, so as to minimize delay of the proceedings. He or she must invoke the right of self-representation clearly and unequivocally. In the event of such an invocation, the court should conduct an inquiry "to ensure the parent understands the nature of the proceeding as well as the problems she may face if she chooses to represent herself." The judge should take appropriate steps, which may include the appointment of standby counsel, so that the parent's decision to represent himself or herself does not disrupt the trial.
>
> [Id. at 132 (quoting J.E.V., 226 N.J. at 114).]

The threshold determination is whether the parent-litigant is capable of

making a knowing and intelligent waiver of the right to counsel and thereafter

proceed pro se in a manner that will not disrupt or impede the orderly

administration of the trial. Id. at 149-50. Here, the record shows A.O.J.

complained to the judge about her OPR attorney's failure to communicate with

her and keep her abreast of the status of the case. However, the judge

continued the case management conference and did not make any effort to

determine the validity of A.O.J.'s complaints. The judge merely "strongly" suggested to A.O.J. to retain private counsel. When considered against the judge's comprehensive familiarity with A.O.J.'s dysfunctional lifestyle and dire financial circumstances, the suggestion to retain private counsel is nothing more than an empty gesture. Equally clear is the absence of any rational basis from which to even infer that A.O.J.'s complaints about her attorney's conduct manifested her clear, unequivocal invocation of the right to waive her constitutional and statutory rights to be represented by the OPR and proceed from this point forward as a pro se litigant. Indeed, the Supreme Court made clear in R.L.M.:

> A parent's complaint about his or her attorney, or his or her plan to replace current counsel with another attorney, is not an invocation of the right of self-representation. As we have noted in a criminal appeal, "[t]he need for an unequivocal request for self-representation by a defendant is a necessary prerequisite to the determination that the defendant is making a knowing and intelligent waiver of the right to counsel."
>
> [236 N.J. at 149-50 (quoting State v. Figueroa, 186 N.J. 589, 593 n.1 (2006)).]

The judge's ill-founded, precipitous decision to treat A.O.J.'s complaints about her attorney as an unambiguous, knowing, and intelligent waiver of the right to counsel irreparably impugned the fairness of this one-day guardianship

trial. The record we have described at length shows, beyond any doubt, that A.O.J.'s rights to be represented by counsel were violated. The mother of these boys was thus relegated to play the role of spectator in the trial that decided her parental rights to these children. The only remedy is to vacate the judgment of guardianship terminating A.O.J.'s parental rights and remand this matter for a new trial.

We are also compelled to comment on the procedural irregularities and lack of decorum that permeated these proceedings. The record shows the judge conducted a number of ex parte conferences and interactions with the DAG and the Law Guardian. A.O.J. was marginalized due to her status as a self-represented litigant. The judge's attempts to have A.O.J. participate telephonically proved to be both ineffectual and frustrating for both A.O.J. and the judge. The judge accepted and relied on hearsay testimony and other forms of incompetent evidence from Division staff members on a number of occasions because A.O.J. did not have an attorney present to protect her interests. We thus conclude that the integrity of the judicial process requires that this matter be assigned to a different judge on remand.

Reversed and remanded. We direct the Presiding Judge of the vicinage's Family Part to assign this case to a different judge. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4795-18T1